**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| DIAHANNE MCCLELLAN, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Case No. 07-CV-36-TCK-FHM** |
| | ) | |
| (1) BOARD OF COUNTY COMMISSIONERS | ) | |
| OF TULSA COUNTY; | ) | |
| (2) TULSA PUBLIC SCHOOLS; and | ) | |
| (3) JUVENILE BUREAU OF DISTRICT | ) | |
| COURT OF TULSA COUNTY; | ) | |
| | ) | |
| **Defendants.** | ) | |

**OPINION AND ORDER**

Before the Court are the Motion for Summary Judgment of Defendant Tulsa School District

(Doc. 68); Defendant Board of County Commissioners of Tulsa County's Motion for Summary

Judgment (Doc. 70); and Defendant Juvenile Bureau's Motion for Summary Judgment (Doc. 113).

The procedural history and facts of this case are complex.

**I.      Procedural History**

On January 7, 2007, Plaintiff Diahanne McClellan ("Plaintiff"), an African-American female,

filed a Complaint naming two Defendants: (1) Juvenile Bureau of District Court of Tulsa County

("Tulsa Juvenile Bureau");[1] and (2) Tulsa Public Schools ("TPS").[2]  Plaintiff identified Tulsa

---

[1]  Tulsa Juvenile Bureau is an entity created by Chapter 4 of the Oklahoma Juvenile Code
("OJC").  *See* Okla. Stat. tit. 10A, § 2-4-101 ("In each county having a population of eighty
thousand (80,000) or more, as shown by the last preceding Federal Decennial Census, there is
created a juvenile bureau . . . .").  Juvenile bureaus consist of a "director" and "other personnel," *see
id.* § 2-4-102, whose duties include "investigat[ing] and report[ing] on all cases that are pending in
the Juvenile Docket of the district court, and investigat[ing] and report[ing] on all cases of
delinquent children and children in need of supervision, residing or being in the county," *see id.* §
2-4-104.  For further explanation of this statutory scheme, see the Court's Opinion and Order

Juvenile Bureau as her former employer and alleged that Tulsa Juvenile Bureau wrongfully terminated her employment, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and 42 U.S.C. § 1981, and that TPS wrongfully refused to hire and/or interview her, in violation of Title VII and 42 U.S.C. § 1981. Tulsa Juvenile Bureau did not file an answer, a responsive pleading, or otherwise enter an appearance within the time provided in Federal Rule of Civil Procedure 12(a). Plaintiff did not move for an entry of default or default judgment.

On April 10, 2007, Plaintiff filed an Amended Complaint ("First Amended Complaint"), dropping Tulsa Juvenile Bureau as a Defendant and naming in its place the Board of County Commissioners of Tulsa County ("Tulsa County").[3] In the First Amended Complaint, Plaintiff identified Tulsa County as her employer and alleged that Tulsa County wrongfully terminated her employment, in violation of Title VII and 42 U.S.C. § 1981. The allegations against TPS remained the same. On April 26, 2007, the Court entered a scheduling order. (*See* Doc. 17.)

On June 28, 2007, Tulsa County filed a motion to dismiss, essentially arguing that it was not Plaintiff's employer under Title VII. Tulsa County represented that it, Tulsa Juvenile Bureau, and the State of Oklahoma had "been in legal disagreement concerning the identity (ies) of the employer for the personnel at the [Tulsa Juvenile Bureau] since 2002 when the first complaint of discrimination was lodged against [Tulsa Juvenile Bureau]." (Tulsa County's Mot. to Dismiss First

denying Tulsa Juvenile Bureau's Motion to Dismiss ("10/2/09 Order") (Doc. 95). The 10/2/09 Order is incorporated herein by reference.

[2] In briefing before the Court, TPS refers to itself as "Independent School District No. 1 of Tulsa County, Oklahoma." For ease of reference and consistency with prior orders, the Court refers to this Defendant as TPS.

[3] Plaintiff did not seek leave of Court to file the Amended Complaint pursuant to Federal Rule of Civil Procedure 15(a); however, no party objected to amendment.

Am. Compl. 12.)  On July 11, 2007, Plaintiff filed an unopposed motion to amend her Complaint for a second time.  Plaintiff contended that, in light of Tulsa County's denial that it was Plaintiff's "employer" and assertion of a "legal disagreement" among various Oklahoma governmental entities on this issue, "[i]t is highly disputed and yet to be determined which entity was specifically in charge of Plaintiff's employment."  (Pl.'s Mot. for Leave to Amend Compl. 1-2.)  The Court granted the motion to amend.

On July 26, 2007, Plaintiff filed a Second Amended Complaint ("Second Amended Complaint") (Doc. 29), re-naming Tulsa Juvenile Bureau as a Defendant and naming, for the first time, Tulsa County Juvenile Justice Trust Authority ("Tulsa Juvenile Trust") and State of Oklahoma, *ex rel.* the District Judges of the Fourteenth Judicial District ("State") as additional Defendants to the wrongful termination claim.  On July 26, 2007, Tulsa County filed a motion to dismiss the Second Amended Complaint, making similar arguments to those in its motion to dismiss the First Amended Complaint.  Specifically, Tulsa County moved to dismiss on three grounds: (1) Plaintiff failed to exhaust administrative remedies because she named only Tulsa Juvenile Bureau and failed to name Tulsa County in her charge filed with the Equal Employment Opportunity Commission ("EEOC"); (2) Tulsa County was not Plaintiff's "employer" for Title VII purposes; and (3) assuming Tulsa County was adjudicated as the "employer" of Tulsa Juvenile Bureau, "its status as employer has no legal efficacy" because the statutes creating such relationship are in violation of the Separation of Powers Clause, set forth at Article 4, Section 1 of the Oklahoma Constitution.

On September 21 and 25, 2007, Tulsa Juvenile Trust and State entered appearances and moved to dismiss all claims against them.  (*See* Docs. 37-41.)  On October 16, 2007, Plaintiff voluntarily dismissed without prejudice her claims against Tulsa Juvenile Trust and State.  Thus, as

3

of October 16, 2007, the remaining Defendants were Tulsa County, Tulsa Juvenile Bureau, and TPS; however, Tulsa Juvenile Bureau had not entered an appearance or otherwise participated in the litigation.

On April 23, 2008, the Court entered an Order denying Tulsa County's motion to dismiss. The Court held: (1) the EEOC exhaustion analysis was intertwined with a substantive aspect of Plaintiff's Title VII claim – namely, whether Tulsa County does or does not qualify as a Title VII "employer" of Plaintiff – and was not the proper subject of a motion to dismiss; (2) the "joint employer" analysis, even assuming it presented a jurisdictional issue, was also intertwined with the merits of Plaintiff's Title VII case – namely, which of the remaining entities, if any, were her employer for purposes of Title VII – and was not the proper subject of a motion to dismiss; and (3) it was premature to consider the constitutionality of any state statutes.  Plaintiff, Tulsa County, and TPS proceeded with discovery in compliance with the scheduling order.

On November 21, 2008, Tulsa Juvenile Bureau first entered an appearance and subsequently filed a motion to dismiss, arguing: (1) Plaintiff failed to state a claim for relief because Tulsa Juvenile Bureau lacked capacity to sue or be sued under Federal Rule of Civil Procedure 17(b) ("Rule 17(b)"); and (2) Plaintiff failed to effect sufficient service of process of the Second Amended Complaint upon Tulsa Juvenile Bureau.  Upon joint motion of all parties, the Court struck the schedule and stayed remaining deadlines pending the Court's ruling on Tulsa Juvenile Bureau's motion to dismiss.  On October 2, 2009, the Court entered an Order denying Tulsa Juvenile Bureau's motion to dismiss and holding that: (1) Oklahoma juvenile bureaus have capacity to sue and be sued; and (2) Plaintiff failed to effectuate service on Tulsa Juvenile Bureau, but the circumstances

4

warranted granting a permissive extension of the service deadline.  As to the latter holding, the Court reasoned:

> This case presents a difficult intersection of factors weighing for and against a permissive extension, and the Court has struggled to balance all factors and reach a fair and reasonable outcome.  The Court concludes that a permissive extension is in the interest of justice and that any resulting prejudice to Defendants or disruption of the Court's docket are necessary under the circumstances.  If the Court fails to grant a permissive extension, Plaintiff will lose her right to sue Tulsa Juvenile Bureau, which, based on the Court's ruling above, has capacity to be sued under Oklahoma law.  Further, if Tulsa County succeeds in convincing this Court or a jury that it is not Plaintiff's "employer" for purposes of Title VII, (*see* Tulsa County's Mot. for Summ. J., Doc. 71), Plaintiff may be left without a remedy against any defendant for her alleged wrongful termination.  In the Court's view, these considerations outweigh the others.  In addition, it appears this case may present unsettled questions of law involving Tulsa County and Tulsa Juvenile Bureau in relation to Title VII liability.  As already evidenced by the "response" brief it filed objecting to Tulsa County's motion for summary judgment, Tulsa Juvenile Bureau's position in this case likely conflicts with Tulsa County's.  In deciding the legal questions presented, the Court and/or jury will benefit from Tulsa Juvenile Bureau's presence.  Although it is a close case, the Court will err on the side of allowing Plaintiff to pursue her claims against all desired defendants.

(10/2/09 Order at 21 (footnotes omitted).)  The Court allowed Tulsa Juvenile Bureau to conduct discovery and file a dispositive motion, which is now pending before the Court along with the motions for summary judgment previously filed by TPS and Tulsa County.

## II.     Factual Background

The following facts, which are derived from the entire record before the Court, are undisputed or are construed in a light most favorable to Plaintiff.

### A.     Creation of Phoenix and 9/17/04 Agreement

Sometime prior to the 2003-2004 school year, Phoenix Alternative School ("Phoenix") came into existence.  Phoenix was the result of a collaborative effort between various governmental entities, including Tulsa County, Tulsa Juvenile Bureau, Tulsa Juvenile Trust, and TPS.  Tulsa

County and Tulsa Juvenile Bureau were involved with Phoenix because, unlike some other alternative schools, the purpose of Phoenix was "to provide school for children who had been suspended, who primarily were wards of the court in delinquent cases." (Shallcross Dep., Ex. H to Juvenile Bureau's Mot. for Summ. J., at 10.)[4] TPS provided the facility,[5] security, books, and supplies for Phoenix. TPS also provided teachers and paid their salaries. TPS did not, however, fund "directors" for Phoenix. Instead, "director" positions were funded by the Tulsa Juvenile Trust.

On September 17, 2004, approximately one year after the Phoenix program began,[6] this collaborative effort was formalized by a contract between TPS and Tulsa County ("Agreement"). (Ex. I to Juvenile Bureau's Mot. for Summ. J.)[7] For purposes of the Agreement, Tulsa County was "operating as the Tulsa County Juvenile Detention Home, Lakeside Home, [the "Homes"] and Phoenix Alternative Program." (*Id.*) The Agreement provides that Tulsa County "desires to obtain [TPS'] educational services for qualified students placed in the Homes and Phoenix," and that TPS "desires to provide educational services to qualified students placed in the Homes and Phoenix." (*Id.*) TPS agreed to provide, *inter alia*, four teachers, four teachers' assistants, and one school registrar, while Tulsa County agreed to provide a Program Director, Learning Director, and an on-

---

[4] At certain relevant times, District Judge Deborah Shallcross ("Judge Shallcross") served as Chief Judge of the Juvenile Division of the Fourteenth Judicial District of Oklahoma, which has statutory supervisory responsibilities related to Tulsa Juvenile Bureau. *See* Okla. Stat. tit. 10A, § 2-4-102.

[5] Phoenix was housed at a TPS facility known as Pershing.

[6] To the extent there were any prior agreements formalizing this relationship, they are not part of the record.

[7] The names of the parties to the Agreement are "Independent School District Number One of Tulsa, Oklahoma" and the "Board of County Commissioners of Tulsa County, Oklahoma." For ease of reference and consistency with the names used in the Order, the Court refers to the parties to the Agreement as TPS and Tulsa County.

site Probation Counselor.  At certain relevant times, Leon Thompson ("Thompson"), an African-American male, served as Program Director; Plaintiff served as Learning Director; and Mary Kevin McNamara ("McNamara"), a Caucasion female, served as the Probation Counselor.

In describing the Learning Director's role, the Agreement provides that the Learning Director "shall provide the [TPS] designee with information regarding the teacher's compliance with the program regulations" and shall "cooperate in the supervision of [TPS] personnel." (*Id.* ¶ 4.) Further, the Learning Director was to provide input to TPS officials regarding curriculum. (*Id.* ¶ 7.)  The Agreement also explains the relationship between the Learning Director and the TPS Director of Alternative Programs:

> The [TPS] Director of Alternative Programs will serve as a liaison between [TPS] and Phoenix.  The Phoenix Learning Director will oversee all aspects of the related service component of the program and work with the [TPS] Director of Alternative Programs in coordinating the educational services component.

(*Id.* ¶ 11.)

The Agreement was executed by a TPS official.  It was also executed by Larry Zachary ("Zachary"), the "interim" Tulsa Juvenile Bureau Director,[8] on the signature line designated for the "Board of County Commissions [sic] of Tulsa County, Oklahoma."  Under his signature, Zachary crossed out "The Board" and wrote "Juvenile Bureau Interim Director."  The Agreement expired July 30, 2005 and was to be re-evaluated in June 2005.  (*Id.* ¶¶ 19-20.)

B.     Plaintiff Hired as Learning Director

Plaintiff is a 53-year old African-American female certified by the Oklahoma State Department of Education ("SDE") to teach kindergarten through eighth grade.  From 1989-2004,

_____

[8] The Tulsa Juvenile Bureau director position was filled by Brent Wolfe ("Wolfe") in June 2004, and Wolfe served as Juvenile Bureau Director at all other relevant times in this lawsuit.

Plaintiff was a full-time TPS employee.  Her positions included, in chronological order, attendance clerk at a high school, office manager at a high school, and third grade teacher at two different elementary schools.  She also served in a part-time position entitled 21st Century Site Coordinator. Plaintiff has obtained some credit toward certification as a school administrator but has never received a school administrator certification from SDE.

Around the fall of 2003, Plaintiff applied for the position of Learning Director for Phoenix. Plaintiff remembers the position being advertised as a TPS position.  Plaintiff interviewed for the position in a conference room at the Tulsa Juvenile Bureau office.  Plaintiff was not hired and continued working as an elementary teacher.  An individual named Cheryl Flowers ("Flowers") was hired.  On or around February 2004, shortly after Flowers was hired, Plaintiff was contacted by a Tulsa Juvenile Bureau staff member named Barbara Walker ("Walker"), who told her that they "made a mistake" in hiring Flowers and hoped Plaintiff would speak with them again regarding the Learning Director position at Phoenix.  Plaintiff testified that she met with Judge Shallcross and Judge Mary Fitzgerald ("Judge Fitzgerald"), again in the Tulsa Juvenile Bureau conference room, and was offered the position of Learning Director.  Plaintiff accepted the job.

On March 8, 2004, Plaintiff sent an email to TPS Superintendent Dr. David Sawyer ("Sawyer"), stating:

> I am writing to request a one year leave of absence for career advancement effective April 8, 2004.  I have been selected as the Learning Director at the Phoenix Alternative School.  Initially when I applied for the position it was advertised as a TPS position.  I have been employed with the District since 1989 however; this is an opportunity for me to grow in my professional career. . . . Because of my working relationship with TPS family, should this position terminate for any reason within the next year, it is my hope to return to the District, with existing years of service and benefits.

(*See* Ex. 9 to Pl's. Resp. to TPS' Mot. for Summ. J.)  On April 7, 2004, after consulting with TPS' Executive Director of Personnel Mary Howell ("Howell") (who was copied on the March 8, 2004 email), Plaintiff drafted a different letter to Howell "resigning" from her TPS teaching position, effective May 7, 2004.[9]  Plaintiff testified that Howell instructed her to draft the resignation letter in this manner. Plaintiff testified as to her belief that she was only resigning temporarily from TPS because the Learning Director position would "hopefully" ultimately be funded by TPS.

At the beginning of her tenure as Learning Director, Plaintiff met with Judge Shallcross on a weekly basis and considered Judge Shallcross her immediate supervisor.  She also considered Judge Fitzgerald and Wolfe as supervisors.[10]  According to Judge Shallcross, Plaintiff's duties were to "provide curriculum, supervision for the teachers, basic, I would call it, troubleshooting. . . .[,] a role to identify problems and solve them."  (Shallcross Dep., Ex. 10 to Pl.'s Resp. to TPS' Mot. for Summ. J., at 14.)

C.      Alleged Lack of Cooperation from Palazzo

Rick Palazzo ("Palazzo") served as the TPS Alternative Education Director.  As evidenced by the Agreement, Plaintiff and Palazzo were expected to cooperate in supervising TPS personnel and providing curriculum and other educational services at Phoenix.  According to Plaintiff, Palazzo was uncooperative and failed to communicate with her.  Specifically, he allegedly failed to inform her of staff meetings involving Phoenix personnel.  On August 30, 2004, a letter was sent to Dr.

---

[9]  Plaintiff maintained her part-time position as 21st Century Site Coordinator and was also employed as director of a TPS after-care program at certain relevant times.

[10]  At some point, Judge Doris Fransein became the Chief Judge of the Juvenile Division; however, Plaintiff does not recall being told that Judge Shallcross was no longer her supervisor.

Mary Guinn ("Guinn"),[11] TPS Deputy Superintendent at relevant times, expressing frustration with Palazzo and stating: "Dr. Sawyer has assured us that he supports this program.  Unfortunately our experience over that last school year has been that in spite of this voiced support, the Phoenix administration has been unable to access that support because we have not had the cooperation of Mr. Palazzo."  (Ex. 7 to Pl.'s Resp. to TPS' Mot. for Summ. J. (detailing instances of lack of cooperation).)[12]  On or around May 31, 2005, Plaintiff was "ccing" Guinn on any emails she sent to Palazzo.  When Guinn inquired as to why Plaintiff was doing this, Plaintiff stated that she was asked by "her supervisor to cc Mr. Palazzo's supervisor whenever I communicate with him via email. Normally I receive quite a bit of resistance from Mr. Palazzo when it comes to communicating with me or resolving TPS issues at Phoenix." (Ex. 8 to Pl.'s Resp. to TPS' Mot. for Summ. J.)

In a deposition taken by Juvenile Bureau in April 2010, after the Court extended discovery based on Juvenile Bureau's late entry into this case, Plaintiff stated: "[Palazzo] never wanted me to be successful in the position because he himself said that the position should be a white person, not a person of color."  (McClellan Dep., Ex. 1 to Pl.'s Resp. to Juvenile Bureau's Mot. for Summ. J., at 58.)  According to Plaintiff, Palazzo said this "in her presence" and she does not remember if anyone else was present.

D.      4/19/05 Letter of Recommendation/Termination Letter

Wolfe sent a letter dated April 19, 2005 "To Whom It May Concern" regarding Plaintiff ("4/19/05 Letter"), stating:

---

[11]  Guinn is an African-American female.

[12]  This version of the letter is unsigned but is on Judge Shallcross's letterhead.

> Diahanne McClennan has been the Learning Director at Phoenix Alternative School since April 8, 2004. The Phoenix School has been a collaborative effort between Tulsa Public Schools and the Tulsa County Juvenile Bureau. . . . Ms. McClellan filled the Learning Director position during the first year of Phoenix operation. She successfully performed the duties of her position during her tenure and helped guide the school through its start up phase. She was responsible for planning and oversight of all academic concerns as well as being involved in areas of behavior management and program development. She acted in a professional manner as well as displaying great care and concern for the students. *Funding for the position of Learning Director has not been reallocated therefore the position will not be filled. As a result Ms. McClellan can no longer be employed in that position as of June 30, 2005.* Ms. McClellan shows great understanding and knowledge of the educational process and particularly in working with youth who are considered to be at risk. I would recommend her for employment and feel certain that she will fulfill her duties and obligations with skill and efficiency.

(Ex. 10 to Pl.'s Resp. to Juvenile Bureau's Mot. for Summ. J. (emphasis added).) Wolfe also told Plaintiff verbally that her position, and the two other Phoenix positions funded by Tulsa Juvenile Trust, were being eliminated due to a lack of funding. Plaintiff's last day as Learning Director was June 30, 2005.

After the 2004-2005 school year ended, Thompson, who served as Program Director, was shifted to another position within the Tulsa Juvenile Bureau. McNamara was, according to Wolfe, terminated but then "rehired" sometime during the next school year for a "similar" position at Phoenix. According to Wolfe, McNamara did not receive a letter similar to the 4/19/05 Letter due to an "oversight." There is no written documentation in the record of McNamara's termination or "rehire." Wolfe admitted that the position for which McNamara was "rehired" was never posted but was instead filled by McNamara without any interview or other formal process. According to Plaintiff, McNamara was not eliminated and then rehired but instead consistently maintained her employment.

11

E.      7/18/05 Funding Request by Wolfe

On July 18, 2005, Wolfe sent a memo ("7/18/05 Memo") to the trustees of the Tulsa Juvenile

Trust, stating:

> Trust Grant to TC Juvenile Bureau in July, 2004                    $155,738
>> The purpose of the grant: to fund three positions in fiscal year FY05.
>> Learning Director & Social Worker   @ $100,791
>> IT Specialist/Programmer            @ $ 54,947
>
> TC Juvenile Bureau expended grant funds in the amount of $89,407.00 for the
> Learning Director and the Social Worker.  The IT Specialist was not hired.  TC
> Juvenile Bureau has the balance $66,330 in a restricted fund with Tulsa County.
> *TC Juvenile Bureau is working with Tulsa Public Schools to operate the Phoenix
> Center again for FY06.*  Discussions are being conducted to determine the
> appropriate staffing, personnel assigned, and operations.  The total cost of funding
> two positions is $95,000.  The Juvenile Bureau would like to expend the existing
> $66,330 fund balance related to the Phoenix Center.  Subsequently in FY06 the
> Bureau would claim the additional funding with monthly invoice billings to the Trust
> as the personnel costs are incurred.  The Juvenile Bureau requests a total grant of
> $95,000 to fund two positions at the Phoenix Center during the fiscal year 2006.

(Ex. F. to Tulsa County's Mot. for Summ. J (emphasis added).)   Wolfe explained this funding

request in his deposition as follows:

> Q:      As of June 30th, had [Plaintiff] been terminated?
> A:      Yes.
> Q:      And 18 days later you were requesting funding for that very same position,
> were you not?
> A:      Correct.
> Q:      And did you have an idea as who you wanted to fill that position when you
> request –
> A:      I wasn't filling the position.
> Q:      But you were requesting the money.
> A:      To be granted to TPS.

(Wolfe Dep., Ex. 10 to Pl.'s Resp. to Juvenile Bureau's Mot. for Summ. J., at 64.)  Thus, Wolfe

testified that he requested funding for the Learning Director position on behalf of TPS.

F.      August 2005 - TPS Job Postings and Search

Sometime prior to August 1, 2005, Sawyer, by and through Bill Naftzger ("Naftzger"), TPS

Chief Human Resources Officer, submitted TPS Board Agenda Item E-5.  This agenda item

recommends approval of creating seven new "administrative" positions, including the "Learning

Director Phoenix Center Academy."  The agenda item states that the position is "grant funded."  The

TPS Board of Education approved this request on August 15, 2005.  In August 2005, TPS began a

search for the Learning Director position.  TPS advertised the position in a "Notice of Vacancy."[13]

It also advertised the position in the Superintendent's Bulletin dated August 29, 2005.[14]  Both

advertisements set forth the following "minimum qualifications:"

> *Certification in elementary/secondary preferred.  Must be able to obtain in one (1)*
> *year from hire date.*  Minimum three (3) years successful teaching experience, (5)
> years preferred in elementary and/or special education; experienced in curriculum
> and program development; experience in alternative education preferred.

(Ex. 8-B to TPS' Mot. for Summ. J (emphasis added).)

According to an affidavit submitted by Guinn, (1) she was ultimately responsible for making

a hiring recommendation to Sawyer to fill the Learning Director position, and (2) Palazzo and

Cynthia Macarevich ("Macarevich"), Principal Leader for Alternative Schools, were responsible for

reviewing applications and interviewing candidates.[15]  In Guinn's view, "administrator certification"

was a minimum qualification for the job.  According to an affidavit submitted by Naftzger, who

drafted the advertisements, the phrase "Certification in elementary/secondary preferred," as used

---

[13]  The "funding source" line on the Notice of Vacancy is blank.

[14]  These two public job postings are collectively referred to as the advertisements.

[15]  Plaintiff contends that Palazzo, not Guinn, was the genuine decision-maker.

13

in the advertisements, means administrator certification as an elementary/secondary school principal issued by SDE.

TPS received eleven applications for the Learning Director position. Five, including Plaintiff, did not hold administrator certifications. None of these applicants received interviews. Of the six that held administrator certifications, two were selected for interviews: William Griffin ("Griffin"), an African-American male, and Don French ("French"), a white male. Guinn averred that, upon the recommendation of Palazzo and Macarevich and based on her own prior supervision of French when they both worked in the Louisiana school system, she made the recommendation to hire French. She and Naftzger stated in their affidavits that Guinn made this recommendation on September 26, 2005. The recommendation was approved by the TPS Board on October 3, 2005, and French's effective date of employment was October 10, 2005. TPS paid French's salary, although the record is unclear as to whether Tulsa Juvenile Trust provided TPS the funds for such salary.

There exists in the record a Job Offer Worksheet for French signed by Sawyer and dated September 26, 2005, which is consistent with Guinn and Naftzger's affidavits. There also exists a Job Offer Worksheet for French, which is not signed or dated by Sawyer, that contains a September 20, 2005 effective date of employment and a September 19, 2005 board meeting date ("Draft Job Offer Worksheet"). Naftzger averred that this second Job Offer Worksheet is a "draft" that he prepared before he received a final recommendation from Guinn. He prepared this draft because, in Naftzger's opinion, French was one of the finalists for the position.

G.      8/31/05 - Plaintiff Applies for Learning Director Position

Plaintiff first learned that TPS was hiring for the Phoenix Learning Director position from the advertisements. On August 31, 2005, Plaintiff sent an email to Linda Earnest, stating: "Pursuant

14

to our conversation on Tuesday, August 31, 2005, I am writing to express my interest in the Learning Director position at Phoenix Learning Academy.  I would like to be considered as a candidate for an interview." (Ex. 12 to Pl.'s Resp. to TPS' Mot. for Summ. J.)  Plaintiff submitted her application to Palazzo and believed he was the one who would contact her for an interview.

H.      September 2005 Emails Between Guinn and Plaintiff

Having heard nothing about the status of her application from Palazzo, on September 22, 2005, Plaintiff sent Guinn an email asking if the Learning Director position had been filled.  Guinn responded: "Could you provide me with answers to my questions regarding your certification as an administrator?  The position requires administrative certification.  Interviews are being scheduled and conducted.  I am unaware of the status of your application due to the question of certification." (Ex. 7-A to TPS' Mot. for Summ. J.)[16]  On September 23, 2005 Plaintiff sent the following response ("9/23/05 Email"):

> Dr. Guinn,
> According to the advertisement in the Superintendent's Bullentin [sic], the candidate for the position of Learning Director did not have to have an administrative certificate but would need to obtain a certificate by the end of the school year.  As I explained to you in a previous email I have taken and passed the first administrative exam and I will be taking the speciality test in February.  To answer your question, I do not have an administrative certificate.  However I thought having worked in that position would make me a great candidate, especially since the candidate would be allowed additional time to obtain an administrative certificate within a year.I understand you are a very busy person and emails like this could be quite annoying. So I seriously appologize [sic] for enrupting [sic] your schedule with this email and *I will certainly withdraw my application.*  I guess the qualifications stated in the Superintendent's Bullentin [sic] was in error.  Dr. Guinn, please know that I am not contacting you because I am looking for any special favors.
> Thank you for your prompt response.

---

[16]    Guinn had previously, in July 2005, asked Plaintiff if she had her administrator certification.  (*See id.*)

15

(*Id.* (emphasis added.)  In her affidavit, Guinn stated that she viewed this email as a withdrawal of Plaintiff's application.  Even if Plaintiff had not withdrawn her application, Guinn stated that she would not have recommended Plaintiff due to Plaintiff's lack of administrator certification.

## III.    Summary Judgment Standard

Summary judgment is proper only if "there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears the burden of showing that no genuine issue of material fact exists.  *See Zamora v. Elite Logistics, Inc.*, 449 F.3d 1106, 1112 (10th Cir. 2006).  The Court resolves all factual disputes and draws all reasonable inferences in favor of the non-moving party.  *Id.*  However, the party seeking to overcome a motion for summary judgment may not "rest on mere allegations" in its complaint but must "set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  The party seeking to overcome a motion for summary judgment must also make a showing sufficient to establish the existence of those elements essential to that party's case.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-33 (1986).

## IV.    Tulsa Juvenile Bureau's Motion for Summary Judgment

Plaintiff contends that Tulsa Juvenile Bureau and/or Tulsa County terminated her from the position of Learning Director on the basis of her race, in violation of Title VII and 42 U.S.C. § 1981.[17]  Tulsa Juvenile Bureau moved for summary judgment on two grounds: (1) Plaintiff cannot establish a prima facie case of discriminatory discharge; and (2) Plaintiff cannot establish that Tulsa Juvenile Bureau's proferred legitimate, non-discriminatory reason ("LNR") for discharge – namely,

---

[17]  Plaintiff has abandoned her sexual discrimination claims.

16

a lack of allocated funding for the Learning Director position – was pretextual.  Tulsa Juvenile

Bureau does not dispute, for purposes of this motion, that it was Plaintiff's employer.

     A.    <u>Burden-Shifting Framework</u>

Where a plaintiff relies on circumstantial evidence, the Court "applies a three step

burden-shifting framework for determining whether a plaintiff's evidence raises an inference of

invidious discriminatory intent sufficient to survive summary judgment." *Adamson v. Multi Cmty.*

*Diversified Servs., Inc.*, 514 F.3d 1136, 1145 (10th Cir. 2008).  "This three-step analysis first

requires the plaintiff to prove a prima facie case of discrimination." *Id.*  If the plaintiff establishes

a prima facie case, "the burden of going forward shifts to the defendant to produce a legitimate,

nondiscriminatory reason for its actions." *Id.*  "If the defendant does so, the plaintiff must either

show that his race, age, gender, or other illegal consideration was a determinative factor in the

defendant's employment decision, or show that the defendant's explanation for its action was merely

pretext." *Id.*

In the absence of affirmative evidence of discriminatory motive, "[a] plaintiff may establish

pretext by showing that the employer's proffered reason for acting adversely towards him is

unworthy of belief." *Id.* at 1146.  The Tenth Circuit has recently clarified, in reversing a lower

court's grant of summary judgment, that it does not employ a "pretext plus standard." *Jones v. Okla.*

*City Pub. Sch.*, 617 F.3d 1273, 1281 (10th Cir. 2010).  "Consequently, once a plaintiff presents

evidence sufficient to create a genuine factual dispute regarding the veracity of a defendant's

nondiscriminatory reason, we presume the jury could infer that the employer acted for a

discriminatory reason and must deny summary judgment." *Id.* (internal quotations omitted).  "A

plaintiff produces sufficient evidence of pretext when she shows such weaknesses, implausibilities,

17

inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Id.* (internal quotations omitted). When evaluating the sufficiency of this evidence, a court looks to several factors, including the "strength of the employee's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered." *Id.*

B.    Plaintiff's Prima Facie Case

"Generally stated, a prima facie case of discriminatory discharge under Title VII requires plaintiff to demonstrate that she (1) belongs to a protected class; (2) was qualified for her position; (3) was discharged; and (4) her position was not eliminated after her discharge." *Id.* at 1050. As explained by the Tenth Circuit, "[w]hen viewed against the backdrop of historical workplace discrimination, an employee who belongs to a racial minority and who eliminates the two most common, legitimate reasons for termination, *i.e.*, lack of qualification or the elimination of the job, has at least raised an inference that the termination was based on a consideration of impermissible factors." *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1229 (10th Cir. 2000).

Tulsa Juvenile Bureau challenges Plaintiff's ability to prove the fourth element – that her position was not eliminated after her discharge. Tulsa Juvenile Bureau contends that the undisputed facts establish that (1) Tulsa Juvenile Bureau eliminated the Learning Director position; (2) TPS assumed responsibility for the Learning Director position, and (3) following Plaintiff's discharge, Tulsa Juvenile Bureau did not "fund or have any other control over the Learning Director position." (Juvenile Bureau's Mot. for Summ. J. 10.) Plaintiff argues simply that the Learning Director

position was never eliminated, given the extensive history and collaborative efforts between Tulsa County/Tulsa Juvenile Bureau and TPS in operating Phoenix.

There are many employment law cases discussing whether a position was actually "eliminated," as opposed to simply re-named, re-posted, and then filled with a different individual outside the protected class. *See, e.g.*, *Haun v. Ideal Indus., Inc.*, 81 F.3d 541, 544-45 (5th Cir. 1996) (finding sufficient evidence to support age discrimination verdict where the plaintiff was told a job was not available because it had been eliminated, but then job was advertised and filled three weeks later by younger individual). That is not the precise issue presented here, since Tulsa Juvenile Bureau admits that the Learning Director position filled by TPS was identical to the position it allegedly eliminated. Instead, Tulsa Juvenile Bureau focuses on the fact that it ceased to have responsibility over the Learning Director position, proving that the position was "eliminated" and then "re-created" by TPS.

The Court concludes that Plaintiff has created a genuine question of fact as to whether the Learning Director position was "eliminated," even though Tulsa County and/or Tulsa Juvenile Bureau lost hiring/firing/supervisory power over the position, and TPS gained hiring/firing/supervisory power over the position. Plaintiff could convince a jury that merely shifting responsibility for the Learning Director position from Tulsa County and/or Tulsa Juvenile Bureau's control to TPS' control does not constitute an elimination of the position. In reaching such conclusion, the Court analogizes the Agreement to some type of corporate joint venture, whereby two entities agreed to jointly manufacture a product. Corporation A provides the manufacturing plant, equipment, and numerous employees, and Corporation B provides three managers, including a Product Director, to oversee the employees at the plant and provide reports to both entities. Prior

19

to termination or re-evaluation of the parties' agreement, Corporation B informs the Product Director that her position is being eliminated due to lack of allocated funds and terminates her. Soon thereafter, Corporation A creates an identical position named Product Director and hires a new person. There is evidence that the two positions were funded by the same source. Under these circumstances, the Court would allow a jury to determine if the Product Director position was ever actually "eliminated," and the Court finds no reason to treat the collaborative educational effort at issue here any differently.

It must be remembered that the prima facie inquiry is aimed at weeding out cases in which the undisputed fact of a job "elimination" precludes any inference of discriminatory discharge. Here, there was not a clear "elimination" of the position because a new position was created that encompassed all of Plaintiff's prior responsibilities and even had the same title. *Cf. Lesch v. Crown Cork & Seal Co.*, 282 F.3d 467, 473 (7th Cir. 2002) (affirming grant of summary judgment because evidence did not indicate that the plaintiff's position was merely "relabeled or continued"; evidence indicated that new entity and new positions were created that encompassed *some* of the plaintiff's old job responsibilities") (emphasis added). The fact that the new position was created by TPS does not, in the Court's view, prevent Plaintiff from making a prima facie case. Instead, Plaintiff has presented sufficient evidence to create a genuine question of fact as to the fourth element of her prima facie case. *See Jencks v. Modern Woodmen of Am.*, 479 F.3d 1261, 1265 (10th Cir. 2007) (explaining that, in order to survive summary judgment, a plaintiff "must raise a genuine issue of material fact" as to each element of prima facie case).

C.      LNR/Pretext

Plaintiff has not presented any evidence of discriminatory motive by Wolfe or any other Tulsa Juvenile Bureau actors.[18]  However, as explained above, a plaintiff may also survive summary judgment in a discriminatory discharge case by creating a genuine factual dispute regarding the veracity of a defendant's LNR.  Here, Tulsa Juvenile Bureau's LNR is "the elimination of Plaintiff's position, due to lack of allocated funding and uncertainty as to the Juvenile Bureau's continued participation in Phoenix."  (Reply in Support of Mot. for Summ. J. 14.)

The Court concludes that Plaintiff has shown weaknesses, implausibilities, inconsistencies, incoherencies, and contradictions in Tulsa Juvenile Bureau's asserted LNR.  For the same reasons explained above, there is a question of fact as to whether the position was "eliminated."  In addition, there also weaknesses in the alleged reasons for the elimination  "lack of Approximately three months after Wolfe wrote the 4/19/05 Letter explaining that the Learning Director position was being eliminated due to lack of allocated funding from the Tulsa Juvenile Trust, Wolfe wrote the 7/18/05 Memo to the Tulsa Juvenile Trust requesting allocation of funds for an identical position. Although Wolfe testified that he was making the request on behalf of TPS, nothing in the 7/18/05 Memo mentions TPS or explains that Tulsa Juvenile Bureau would no longer be supervising the Learning Director position.  These two documents are arguably facially inconsistent.  The 4/19/05 Letter indicates that the Tulsa Juvenile Trust had decided not to allocate funds for the Learning Director position for the 2005-06 school year, but the 7/18/05 Memo specifically requests funding for the Learning Director position for the 2005-06 school year.  The wording of the 7/18/05 Memo indicates that it was the first request made regarding the 2005-06 school year.  Although Wolfe has

_____

[18]  Palazzo, who allegedly made a comment about race, is a TPS employee.

presented an explanation for this seeming inconsistency, Plaintiff has presented sufficient evidence to create a question of fact as to the veracity of the LNR stated in the 4/19/05 Letter.

Plaintiff has also shown that the other component of Tulsa Juvenile Bureau's asserted LNR – uncertainty as to Tulsa Juvenile Bureau's continued participation in Phoenix – is contradicted by what actually transpired.   Tulsa Juvenile Bureau remained involved with Phoenix in the 2005-06 school year and continued to fund and oversee at least one employee at Phoenix – McNamara.  Tulsa Juvenile Bureau's explanation that McNamara was also terminated due to a lack of allocated funding, but then almost immediately "rehired" for a similar position beginning in the 2005-06 school year, could be viewed as implausible.   Likewise, Tulsa Juvenile Bureau's explanation that McNamara did not receive a letter similar to the 4/19/05 Letter due to an "oversight" could be viewed as implausible.   Therefore, Plaintiff has created a genuine question of fact regarding the veracity of Tulsa Juvenile Bureau's LNR, and the Court must deny summary judgment.  *See Jones,* 617 F.3d at 1281.

## V.    Tulsa County's Motion for Summary Judgment

Uncertain if Tulsa County, Tulsa Juvenile Bureau, or both were her employers,[19]  Plaintiff asserted identical claims against Tulsa County – namely, discriminatory discharge on the basis of her race, in violation of Title VII and 42 U.S.C. § 1981.   Tulsa County moved for summary judgment, arguing that it was not Plaintiff's employer for purposes of Title VII under either a "single employer" or "joint employer" analysis.   Tulsa County maintains that it was not Plaintiff's "employer," or Wolfe's employer, because the relevant state statute, *see supra* n.4, indicates that the

---

[19] Plaintiff elected to dismiss her claims against the State and Tulsa Juvenile Trust (originally alleged as other potential employers), *see supra* Part I, leaving only Tulsa County and Tulsa Juvenile Bureau as the two potentially liable employers in this case.

Chief Judge of the Juvenile Division, of which it has no direction or control, was the individual who controlled and supervised Plaintiff's employment.  (*See* Tulsa County's Mot. for Summ. J. 12-19 (arguing that "the Oklahoma Legislature intended that the Judge of the Juvenile Bureau was to enjoy the authority to pick a director and counselors and other employees that would perform those duties" and that a "county and a district court are Constitutionally separately created and a court does not manage a county").)  In contrast, Plaintiff contends that Tulsa County and Tulsa Juvenile Bureau were joint employers[20] at the time of her termination, such that Tulsa County is also liable for her alleged discriminatory discharge.[21]  Tulsa County did not file a reply brief, and the Court therefore does not have the benefit of Tulsa County's responses to certain arguments raised by Plaintiff.

When a plaintiff alleges that two separate entities co-determine the terms and conditions of employment, as Plaintiff does here, the Tenth Circuit employs a joint-employer test.  *See Bristol*, 312 F.3d at 1218.  The joint-employment concept recognizes that "[w]hen a worker is formally employed by one organization, but important aspects of his work are subject to control by another organization, both organizations are employers of the worker." *Sizova v. Nat'l Inst. of Stds. & Tech.*, 282 F.3d 1320, 1330 (10th Cir. 2002) (internal quotations omitted).  Under the joint-employer test,

---

[20] Plaintiff does not contend that Tulsa Juvenile Bureau and Tulsa County should be treated as a single, integrated employer.  Therefore, the Court need not apply the "single-employer" test discussed in Tulsa County's brief.  *See Bristol v. Bd. of Cnty. Comm'rs of Cnty. of Clear Creek*, 312 F.3d 1213, 1218 (10th Cir. 2002) ("Although these two tests are sometimes confused, they differ in that the single-employer test asks whether two nominally separate entities should in fact be treated as an integrated enterprise, while the joint-employer test assumes that the alleged employers are separate entities.").

[21] As explained by the Court in its Order holding that juvenile bureaus have capacity to be sued, the Oklahoma Attorney General has expressed his opinion that counties are liable for any judgments entered against juvenile bureaus.  *See* 2008 OK AG 30, ¶¶ 20-22.  Thus, Tulsa County may be obligated to pay any judgment in favor of Plaintiff regardless of whether it is deemed a joint employer or not.

independent entities are treated as "joint employers if the entities share or co-determine those matters governing the essential terms and conditions of employment." *See Bristol*, 312 F.3d at 1218 (internal quotations omitted).   "In other words, courts look to whether both entities exercise significant control over the same employees." *Id.* (internal quotations omitted).  The Tenth Circuit has stated that "[m]ost important to control over the terms and conditions of an employment relationship is the right to terminate it under certain circumstances." *Id.* at 1219.  The Tenth Circuit has also clarified that "[b]udgetary power, in and of itself, does not establish the control necessary to treat" an entity as a joint employer with another entity that exercises hiring, firing, and supervisory decisions over a particular employee.  *Id.*  As a general rule, determining whether an entity qualifies as an employer is a fact issue for the jury.  *Id.* at 1221.

Plaintiff has presented sufficient evidence to reach a jury on the question of whether Tulsa County was a joint employer of Plaintiff.  First, the Agreement creating the Learning Director position is between Tulsa County and TPS, indicating that Tulsa County played a significant role in creation of the position.  Although Zachary signed the Agreement as "Interim Juvenile Bureau Director" and crossed through "The Board" at the conclusion of the document, this does not negate the document's potential evidentiary value in proving Tulsa County's employer status.  Second, Judge Shallcross, who was the Chief Judge of the Juvenile Division and supervisor of Wolfe (the individual who terminated Plaintiff), testified that: (1) Plaintiff was hired through the "Tulsa County" hiring process; (2) Tulsa County "cut the checks" issued to Plaintiff at all times prior to her termination; and (3) at least two of the individuals at Tulsa Juvenile Bureau with the power to

supervise and terminate Plaintiff, Wolfe and Walker, were employees of Tulsa County.[22]  Judge Shallcross further testified as to her opinion that Plaintiff's employer was Tulsa County.

The Court finds these facts sufficient to reach a jury on the question of whether Plaintiff was an employee of Tulsa County at the time of her termination, either because Tulsa County directly exercised control over the terms and conditions of Plaintiff's employment or because Tulsa County had actual or de facto control over Tulsa Juvenile Bureau's employees' decisions.  *See Graves v. Lowery*, 117 F.3d 723, 727-28 (3d Cir.1997) (affirming verdict in favor of a county because it exercised control over court clerks' daily employment activities by virtue of its funding, actions, and policies); c*f. Bristol*, 312 F.3d at 1219 (holding that, after receiving trial evidence, court should have directed verdict in favor of board of county commissioners) (evidence showed that board of county commissioners was not joint employer with county sheriff over confinement officer *because board had no actual or de facto authority over county sheriff's employment decisions*) (emphasis added); *Sandoval v. City of Boulder, Colo.*, 388 F.3d 1312, 1324 (10th Cir. 2004) (holding that City of Boulder was not joint employer with Boulder Regional Communications Center ("BRCC") Executive Committee ("EC") because, under the terms of the contract creating the position for which the plaintiff was not hired, "the position was hired by the EC, paid out of the BRCC budget, and served at the pleasure of the EC," and "the City's only control over the terms and conditions" of employment was through a two-person representation on the EC).  Unlike in *Sandoval*, the

---

[22] A juvenile bureau director's authority to terminate "other employees" of a juvenile bureau is now codified, *see* Okla. Stat. 10A, § 2-4-102 ("The counselors and other employees may be removed by the director."), although it was not at the time of Plaintiff's termination.

Agreement creating the Learning Director provides that Tulsa County, and not some other entity, was responsible for hiring, paying, and supervising the Learning Director position.

## VI.     TPS' Motion for Summary Judgment

Plaintiff contends that TPS refused to interview and/or hire her for the position of Learning Director on the basis of her race, in violation of Title VII and 42 U.S.C. § 1981.  TPS moved for summary judgment, arguing that (1) Plaintiff cannot establish a prima facie case of discriminatory refusal to hire; and (2) Plaintiff cannot establish that TPS' proferred LNR for failing to interview and/or hire her – namely, lack of administrator certification – was pretextual.  The Court applies the burden-shifting analysis explained *supra* Part III.A.

### A.     Prima Facie Case

A prima facie case of discriminatory failure to hire requires a plaintiff to demonstrate that "(1) the plaintiff is a member of a protected class; (2) the plaintiff applied for and was qualified for an available position; (3) the plaintiff was rejected despite being qualified; and (4) the position remained open as the employer continued to search for applications or the position was filled by a person not of the protected class."  *Randle v. City of Aurora*, 69 F.3d 441, 451 n.13 (10th Cir. 1995). TPS challenges Plaintiff's ability to satisfy the second and third elements because Guinn believed Plaintiff's 9/23/05 Email constituted a withdrawal of her application for the Learning Director position.  For purposes of disputing whether Plaintiff can establish a prima facie case, TPS does not dispute Plaintiff's qualifications but instead focuses on the lack of any "application" or "rejection" required by the second and third elements.

Plaintiff contends that she has made a sufficient showing that she "applied" and was "rejected" because: (1) the 9/23/05 Email could not constitute a withdrawal because the decision to

26

hire French had already been made by September 23, 2005, as evidenced by the Draft Job Offer Worksheet prepared by Naftzger; (2) Palazzo, and not Guinn, was responsible for making the hiring decision, such that the 9/23/05 Email to Guinn could not constitute a formal withdrawal of her application; and (3) if Guinn perceived the email as Plaintiff's withdrawal, such decision was unreasonable in light of other statements in the email and Plaintiff's subsequent attempts to contact Palazzo about the position.

Plaintiff has raised genuine questions of material fact that preclude any grant of summary judgment based on Plaintiff's inability to establish a prima facie case.  First, Plaintiff adamantly denies that she withdrew her application or had any intent to withdraw her application.  Second, there is evidence that Plaintiff submitted her application to Palazzo, that Palazzo was the individual reviewing applications and conducting interviews, and that Plaintiff believed any formal withdrawal of her application would need to be communicated to Palazzo rather than Guinn.  Third, the 9/23/05 Email is by no means an unequivocal, unambiguous document that is subject to only one reasonable interpretation.  Plaintiff began the email by stating that she believed she met the qualifications set forth in the Notice of Vacancy.  One interpretation of the 9/23/05 Email is that Plaintiff would withdraw her application from Palazzo if Plaintiff determined, as asserted by Guinn, that she was not actually qualified for the position.  Finally, the Draft Job Offer Worksheet raises some question as to whether the hiring decision was made prior to the 9/23/05 Email.  Guinn has stated otherwise, and Naftzger offered an explanation for the existence of and dates contained within the Draft Job Offer Worksheet.  However, Plaintiff has presented evidence raising an inference that at least some informal decision to hire French may have been communicated to Naftzger prior to the 9/23/05 Email, such that any withdrawal therein was irrelevant.

TPS contends that Plaintiff's intent and/or the reasonableness of Guinn's alleged interpretation of the 9/23/05 Email, are irrelevant. (*See* TPS' Mot. for Summ. J. 20 (arguing that the only relevant issue is "whether Guinn viewed McClellan's e-mail to be a withdrawal of her application").) TPS did not cite case law discussing withdrawal of an application or a plaintiff's prima facie burden. Instead, TPS cited *Hardy v. S.F. Phosphates, Limited*, 185 F.3d 1076, 1080 (10th Cir. 1999), which discussed the "pertinent" question in determining pretext as whether an employer genuinely believed an employee had engaged in sexual harassment or was using this as a pretext for illegal discrimination. The court emphasized that the issue was not whether the employer was *correct* that the employee had engaged in misconduct but instead whether that belief was *genuine*. *Id.*

*Hardy*'s rationale does not apply to an employer's incorrect or unreasonable, but genuine, belief that an employee withdrew an application. As a matter of policy, an employer should not be able to avoid Title VII liability based on its asserted belief, no matter how unreasonable or incorrect, that a plaintiff withdrew her application. If a genuine question of fact exists as to whether withdrawal occurred, this should be decided by a jury. All cases cited by TPS discussing withdrawal of applications as precluding liability involved either factual determinations after trial or undisputed facts. *See Love v. Alamance Cnty. Bd. of Educ.*, 757 F.2d 1504, 1510 (4th Cir. 1985) (affirming district court's factual finding, after bench trial, that plaintiff withdrew her application and therefore failed to establish prima facie case and noting that this question "rested largely on credibility determinations"); *Sanchez v. Univ. of Conn. Health Care*, 292 F. Supp. 2d 385, 394 (D. Conn. 2003) (plaintiff unequivocally testified that she withdrew her application and court therefore found that she could not establish prima facie case); *Trainor v. SBC Servs., Inc.*, No. 04-C-779, 2006 WL

644483, at * 5 (N.D. Ill. March 7, 2006) (citing the plaintiff's deposition testimony and concluding that it was "undisputed that [the plaintiff] voluntarily withdrew her application for that position because the position would eventually be phased out").  Here, Plaintiff denies that any withdrawal occurred, and the 9/23/05 Email is not sufficient to entitle TPS to summary judgment.

      B.     <u>LNR/Pretext</u>

For purposes of TPS' motion, Plaintiff did not present any evidence of discriminatory motive by Palazzo, Macarevich, or Guinn – the three TPS officials involved in the Learning Director hiring decision.[23]  However, as explained above, a plaintiff may also survive summary judgment by creating a genuine factual dispute regarding the veracity of a defendant's LNR.  Here, TPS' asserted LNR for failing to interview or hire Plaintiff for the Learning Director position was Plaintiff's lack of administrator certification.

Plaintiff has created a genuine question of fact as to the veracity of this asserted LNR.  First, this LNR could be construed by a jury as contrary to the stated qualifications in the two TPS advertisements.  The relevant language used was "Certification in elementary/secondary preferred. Must be able to obtain in one (1) year from hire date."  Although Naftzger stated in his affidavit that this means "administrator certification," the language is less than clear and could refer to elementary/secondary teaching certification, which Plaintiff possessed.  Further, the relevant TPS board minutes approving creation of the Learning Director position reflect creation of 7 "administrative" positions, 0 "certificated" positions, and 7 "support" positions. This creates further confusion, as TPS has described its LNR as Plaintiff's lack of "administrative certification."

---

[23] Plaintiff first testified about Palazzo's discriminatory remark in a deposition conducted after the briefing for this motion was concluded, and Plaintiff did not move to supplement the evidentiary record.

Further, even assuming TPS' interpretation of the advertisements is correct, administrative certification was only "preferred" and not "required." Plaintiff presented evidence that she had begun work toward her administrative certification and would be able to complete it within one year of the hire date. If TPS' LNR is indeed contrary to its stated qualifications, and Plaintiff satisfied the stated qualifications, this could tend to show a lack of credibility in TPS' proffered LNR for failing to interview or hire Plaintiff. *See Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1226-27 (2nd Cir. 1994) (reversing grant of summary judgment in favor of employer) ("Thus, even were [the defendant] truthful in its assertion that the advertised position included responsibility for external communications, [the plaintiff] had extensive previous successful experience in that field. What [the defendant] intended when it advertised this position and why it did not interview [the plaintiff] who was well qualified for the position present genuine issues of material fact as to whether [the plaintiff's] reduction-in-force was a pretext in her case for age discrimination.").

Second, Plaintiff has shown that, assuming administrative certification is a listed preference in the advertisement, the decision-makers did not follow other listed preferences in making their decision. For example, another listed preference was for someone with experience in "alternative education," which French did not possess. This evidence could tend to show that the listed criteria did not actually dictate the decision, and that a plaintiff who did not satisfy all the stated criteria may nonetheless have been qualified for the position. *See Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 466 (6th Cir. 2003) ("When neither the plaintiff nor the selectee meets all the stated criteria, the qualified prong is satisfied for summary judgment purposes, because a genuine issue of material fact arises as to whether the posted standards actually dictated whether Plaintiff was qualified").

Third, Plaintiff has presented evidence that the listed qualifications were the same as when she originally applied for the position with Tulsa Juvenile Bureau and/or Tulsa County.  Plaintiff has presented evidence that she received positive performance evaluations and what amounts to a glowing recommendation letter from Wolfe.  Thus, despite initially being qualified for the position, having acquired over one year's experience in the position, and having received only positive performance evaluations, TPS' asserted LNR for failing to interview/hire is Plaintiff's lack of minimum qualifications to receive an interview.  Given the overall circumstances presented, which include facts giving rise to an inference of a strained relationship with Palazzo during Plaintiff's tenure as Learning Director, *see supra* Part II.C, [24] the Court finds that the LNR asserted could be viewed as lacking veracity.[25]

**VII.    Conclusion**

The Motion for Summary Judgment of Defendant Tulsa School District (Doc. 68) is DENIED; Defendant Board of County Commissioners of Tulsa County's Motion for Summary Judgment (Doc. 70) is DENIED; and Defendant Juvenile Bureau's Motion for Summary Judgment (Doc. 113) is DENIED.

---

[24] For purposes of this motion, the Court need not resolve whether Palazzo or Guinn was the ultimate decision-maker.  It is not disputed that Palazzo was heavily involved in the interviewing and hiring process.

[25] The Court rejects TPS' argument that "it was free to focus interviewing and hiring on those applicants who exceeded the minimum qualifications" as a matter of "business judgment." (TPS' Mot. for Summ. J. 23.)  Although this is certainly an argument that can be made to a jury, the fact that TPS' LNR arguably does not align with the posted requirements, combined with all other circumstances presented, is sufficient to preclude summary judgment in favor of TPS.

IT IS SO ORDERED this 5th day of November, 2010.

TERENCE KERN
UNITED STATES DISTRICT JUDGE